UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:14-CV-550

| | |
|---|---|
| JAYSON CONTINO, an individual, and<br>MAMYE CONTINO, an individual,<br><br>*Plaintiffs,*<br><br>vs.<br><br>FRONTIER ADJUSTERS, INC.,<br>FRONTIER ADJUSTERS OF ARIZONA, INC.,<br>FRONTIER ADJUSTERS OF AMERICA, INC.,<br>MERRYMEETING, INC., JOHN M. DAVIES, an individual, EDWARD FERRIE, an individual,<br>PATRICK ENTHOVEN, an individual,<br>JEFFREY HARCOURT, an individual, and<br>MILO BOLENDER, an individual,<br><br>*Defendants.* | **VERIFIED COMPLAINT**<br>**(JURY DEMANDED)** |

NOW COME Plaintiffs Jayson Contino ("J. Contino) and Mamye Contino ("M. Contino") (collectively, "Plaintiffs" or the "Continos") by way of Verified Complaint and Jury Demand, state as follows:

## SUMMARY OF THE ACTION

1) The instant action arises out of the purposeful and deceptive interference in Plaintiffs' insurance adjuster franchised business operations located throughout the State of North Carolina, through a covert and deceptive scheme to divert case files from Plaintiffs to the franchisor, its representatives or favored franchisees at the expense for Plaintiffs and others similarly situated.

2) In addition, this is also a case about the Defendants' material modification of the franchise system, brought on by new ownership and the greed of its individual

1

representatives, resulting in the complete and utter alteration of the nature of the parties' business relationship and the destruction of certain franchisee operations through tactics of unfair competition.

3) This matter also regards ongoing deceptive franchise practices in violation of both federal regulations and state statutory law, to force loyal franchisees, in good standing, out of the system for Defendants' own pecuniary gain; and to induce franchisee spouses to sign franchise agreements, invest marital monies in a franchise business, without proper federally mandated disclosures in violation of the Federal Trade Commission ("FTC") Rule 436.

## THE PARTIES

4) Plaintiff Jayson Contino is a resident of the State of North Carolina and a franchisee in the Frontier Adjuster franchise.

5) Plaintiff Mamye Contino is a resident of the State of North Carolina, the spouse of Jayson Contino, and a franchisee in the Frontier Adjuster franchise.

6) Defendant Frontier Adjusters, Inc. ("Frontier") is a Colorado corporation with its principal place of business located at 4745 N. 7th Street, Suite 320, Phoenix, Arizona 85014.

7) Defendant Frontier America ("Frontier Am.") is an Arizona corporation with its principal place of business located at 4745 N. 7th Street, Suite 320, Phoenix, Arizona 85014. Frontier America is the sole owner of Defendant Frontier Arizona ("Frontier Az.").

8) Defendant Merrymeeting is a Delaware corporation with its principal place of business located at 7100 E. Pleasant Valley Road, Suite 300, Independence, Ohio 44131.

Merrymeeting is the sole owner of Defendant Frontier America and conducts the affairs of Frontier.

9) Defendant John M. Davies is a citizen of the State of Ohio and the President, Chief Executive Officer and Chairman of the Board of the Frontier Defendants. Davies is 50% owner and board member of Defendant Merrymeeting. Davies is the sole member and owner of Defendant Marathon. Davies is a board member of Defendant Frontier.

10) Defendant Edward "Ed" Ferrie is a citizen of the State of Arizona, a manager employed by the Frontier Defendants and, simultaneously, an undisclosed franchisee of the Frontier Defendants in Tempe, Arizona.

11) Defendant Patrick Enthoven is a citizen of South Africa and resident of the State of California; and board member of Defendant Merrymeeting and Defendant Frontier.

12) Defendant Jeffery Harcourt is a citizen of the State of Ohio and is the Chief Operating Officer of Frontier.

13) Defendant Milo Bolender is a citizen of the State of Ohio and is the Senior Vice President and General Manager of Frontier.

14) Defendants each transact business in the State of North Carolina by franchising Frontier Adjusters business, as well as other franchised businesses, in North Carolina.

## **VENUE AND JURISDICTION**

15) This Court has jurisdiction over this matter by reason of diversity of citizenship, 28 U.S.C. § 1332, in that Plaintiffs are residents of the State of North Carolina, Defendant Frontier has principal officers in the State of Maryland, Frontier America has offices in the State of Arizona, Defendant Davies is a citizen of the State of Ohio and Defendant Ferrie is a citizen of the State of Arizona.

16) Venue is also proper as the subject matter of this dispute is in this district and Plaintiffs reside in this district.

## FACTS COMMON TO ALL COUNTS

### A. History of the Frontier Franchise

17) Frontier has been in operation since 1959. The Frontier franchise system consists of hundreds of individual franchisees who are independent insurances adjusters, owning and operating their own independent insurance adjusting businesses.

18) Frontier franchisees perform services for their clients (insurance companies and self-insured entities) including insurance related claim investigations, appraisals and other services.

19) Under the Frontier system, prospective franchisees who are experienced insurance adjusters, having met the qualifications established by Frontier, are granted a license to join the Frontier system of independent insurance adjusters and a right to do business, as an independent business owner, under the Frontier name.

20) Over the course of the years that Frontier has sold and operated under independent adjuster franchises, different franchise agreements have been utilized by Frontier.

21) Originally, Frontier granted exclusive geographic territories in which the franchisee had the exclusive right to use the Frontier name and operate a Frontier franchise to the exclusion of any other franchisee ("The Original Agreements").

22) Under the Original Agreements, Frontier granted to the franchisee the following:

    (i) An exclusive franchise, for a set period of time, to engage in the business of independent insurance adjusting within a specified geographic area shown by a map attached to the agreement; and

4

(ii) The right to use the name "Frontier Adjusters" as the trade name of the Franchisee in coordination with whatever exclusive geographic territory had been granted to the franchisee.

23) The Original Agreements memorialized the geographical exclusivity of the parties' contract, as follows:

(i) Franchisor will have, from time to time, national or territorial accounts that require activities at or near the Advertised Location. Franchisee acknowledges that such national and territorial activities are reserved unto Franchisor; however, to the extent that Franchisor refers any business from such accounts to its Franchisees, Franchisor shall refer all such work to Franchisee or franchisees with the nearest advertised location to the situs of the specific matter, to the extent such franchisee is qualified and has the capacity and capability, in Franchisor's reasonable judgment, to handle such referral.

24) Additionally, under the Original Agreements, Frontier provided, as an inducement, certain pre-printed forms for the use of the franchisee. Under the Original Agreements, the franchisee was obligated to:

(i) Pay a royalty fee of a set percentage of the franchisee's gross billings to Frontier as the franchisor;

(ii) Refrain from operating a competitive insurance adjusting business;

(iii) Pay all of the franchisee's own operating and business expenses without contribution by Frontier as franchisor;

(iv) Refrain from acting in way prejudicial or injurious to the Frontier organization or Frontier name.

25) Specifically, Section 10.1 of the Original Agreements stated:

"The Franchisee shall have complete and absolute control in all matters involving discretion and judgment in the operation of the Franchisee's business, and both parties recognize and acknowledge that in all business transactions occurring pursuant to the terms of this Agreement, the Franchisee is an independent contractor."

5

26) During J. Contino and M. Contino's initial franchise term, Frontier originally made very minimal efforts to include advertising in trade magazines and the production of an annual list of Frontier franchisees which it sent to insurance companies on a mailing list.

27) Other than these nominal efforts, Frontier expected and relied upon its individual franchisees to perform their own marketing and advertising, attract their own business, and retain and grow that business and list of clientele through repeated good work and client satisfaction.

28) On August 12, 2009, Defendant Davies, on behalf of all Defendants, in a Memorandum to all franchisees, and admitted that in years prior, sales and marketing, and the acquisition and retention of clients, was not a focus of Frontier, and that is had been the responsibility of franchisees to sell and market their own services, stating:

> *"When we first acquired Frontier Adjusters in 2001, the corporate office had a very minimal direct sales and marketing program. The corporate office's primary marketing focus was to distribute the Frontier Office Directory and generally encourage customers to make assignments directly to the appropriate, local Frontier office. At the time, Frontier did not have a corporate call/assignment center and, in fact, we only received a small number of after-hours emergency assignments."*

29) Due to franchisees own independent business experience and acumen, Frontier franchisees performed their own marketing and advertising for their own individual franchises and locations, and through these efforts, expense, repeated good work and client satisfaction, grew their individual businesses and their list of clientele. As a result, franchisees developed and retained clientele over years by the individual franchisees of whom would repeatedly return to assign insurance investigations directly to those individual franchisees.

30) Over the years, franchisees developed significant and ongoing business relationship with their clientele. Notably, Frontier, as franchisor, did not play any role in the consummation and retention of franchisee clientele.

31) Under the Original Agreements, Frontier did not receive insurance adjusting assignments directly from clients; open competitive, corporate-owned, franchises; solicit or obtain accounts on a corporate or national basis; or compete with franchisees by attempting to market or sell to established clients of the franchisees with the intent of receiving assignments from that clientele and re-assigning the work to favored franchisees.

32) Notably, the more recent franchise agreements are devoid of an exclusive geographic territory and merely grant the franchisees the right to use the Frontier name in conjunction with a specific city.

B. **Secret Implementation of National and Regional Customer Program**

33) On August 13, 2009, Frontier announced a sweeping change in the Frontier system to go into immediate affect and be fully implemented by April 5, 2010.

34) This scheme, which is at the core of the instant action, was to be known as the Frontier Adjusters National and Regional Customer Program ("FANRCP").

35) The FANRCP scheme was devised and executed by Frontier at the express direction and collusion of Defendants Davies, Ferrie, Enthoven, Harcourt and Bolender.

36) On October 14, 2009, in a memorandum sent to all franchisees, Defendant Davies outlined the aspects of the FANRCP program, along with a written admission regarding the FANRCP Program, stating "…the strategy we are implementing is consistent with what we had in mind when we acquired Frontier 8 years ago!"

37) In actuality, the FANRCP scheme, which materially changed – detrimentally – the nature of Frontier's business, was planned and known to Frontier and Defendants since at least the year 2001, but was kept secret so that franchisees and prospective franchisees, would make material decisions regarding acquisitions and operation of franchises, acquiescence of certain Frontier programs such as call centers, and in the way the franchisees conducted business, without knowledge of the FANRCP scheme.

38) In furtherance of the secret implementation of the FANRCP program in the years 2001 to 2009, Defendants put into place multiple aspects of the FANRCP program, including, but not limited to:

    (i) a call center to receive client assignments;

    (ii) a required computer system which provided to Frontier the names, contact information, and claim specifics of all assignments received, and claims investigations conducted by all the franchisees;

    (iii) seeking ownership by the Franchisor through its required computer system, of all data related to clients and client assignments;

    (iv) seeking authority for the Franchisor to dictate to the Franchisee the rates that would be charged for assignments;

    (v) seeking authority for the Franchisor to determine the Franchisee's legal rights regarding collection of invoices for work performed;

    (vi) establishing unreasonable minimum billing requirements for the Franchisees which the Franchisor used selectively, arbitrarily and capriciously for the purpose of eliminating Franchisees who were disfavored; and

    (vii) use of Software and other computer systems, mandatory disclosure of their insurance industry client and associated contact information prior to the effective date of FANRCP.

39) Despite emphatic opposition from franchisees, between September of 2009 and April 5, 2010, Frontier forcefully implemented the FANRCP against its franchisees.

40) The Franchisor, in anticipation of its imposition of FANRCP, had engineered Franchisee reliance on the Franchisor to obtain assignments from clients, and planned to use that reliance against any Franchisee that did not accept the program.

41) As such, the consequential franchisee-dependence stemming from the FANRCP, endowed the Franchisor with the capacity to make its threats and coerce franchisees into compliance.

42) By way of example, the Franchisor established unreasonable minimum billing requirements and threatened to withhold assignments and billings from the Franchisees, or elimination from the system.

The essential elements of the FANRCP scheme include:

(i) Frontier directly solicits clients, including existing clients of the individual franchisees, that were assigning work directly to the individual franchisees, in order to convert them to Frontier controlled clients called "FANRCP clients";

(ii) The focus of Frontier's increased sales and marketing efforts is to solicit clients, including existing clients of the individual franchisees, and entice these clients to agree to become "FANRCP clients";

(iii) Once the clients become FANRCP clients, the clients are directed to send their assignments directly to Frontier, bypassing the individual franchisee and no longer sending assignments directly to the franchisee of the client's choice;

(iv) Once Frontier receives the assignments from the FANRCP client, it sends the assignment to the franchisee of Frontier's choice based on Frontier's own determinations, or, alternatively, as punishment to any Franchisee who has not agreed to accept FANRCP, Frontier will send the assignments to the non-advertised undisclosed franchise

9

> ostensibly owned by Frontier executive employee Ferrie but, upon information and belief, controlled by Frontier. This non-advertised franchise then sends the assignment to non-Frontier affiliated direct competitors of franchisees (even when a franchisee signed the FANRCP consent form, claims are still diverted to neighboring and favored Frontier Franchisees, Ferrie's unregistered Tempe franchise, or unaffiliated competing insurance adjusters) if the franchisee does not participate in the FANRCP Program; and
>
> (v) Frontier has instituted a plan to convert at least 70% of clients to FANRCP by 2016.

43) Upon information and belief, FANRCP grants Defendants unfettered control over assignment distribution to other franchisees. Further, FANRCP enables Defendants to force franchisees to take assignments that they do not wish to take, and at Franchisor-determined prices.

44) Moreover, if a franchisee does not participate in the FANRCP Participation Agreement, as punishment, the franchisee will not receive any assignments from existing or prospective clients solicited by Frontier.

45) Upon information and belief, Frontier uses its marketing and sales department to solicit current and prospective clients to the FANRCP Program and refuses to forward assignments from these clients to franchisees who have not agreed to execute the Participation Agreement. Execution of the Participation Agreement, therefore, is not in actuality voluntary, but is coerced and punitive.

**C.  Diversion of Business to Corporate and Favored Franchisees**

46) Upon information and belief, Defendants Ferrie and Frontier sell claims to direct competitors, Custard Insurance and Bulldog Insurance, because these entities pay a forty percent (40%) fee, rather than the fifteen percent (15%) fee paid by Frontier franchisees.

10

Case 3:14-cv-00550-FDW-DSC   Document 1   Filed 10/06/14   Page 10 of 19

47) Upon further information and belief, Defendant Ferrie has his own side-business and a secret Frontier franchise location in the State of Arizona. Through Ferry's secret franchise, Ferry intercepts claims from the home office and sells them to business throughout the United States.

48) Upon further information and belief, Frontier has been systematically steering business from Plaintiffs toward "favored" franchisees, which contravenes paragraph 1.4 of the Original Agreements. This type of sabotage is found throughout the system and numerous franchisees in different states have complained about the purposeful diversion of claims.

D. **Negligent Hiring and Retention of Defendant Edward Ferrie**

49) Upon information and belief, Defendant Ferrie has a history of professional misconduct and actionable business transgressions, including a 2011 judgment against Defendant Ferrie's corporation, EBF, Inc. in Broward County, Florida, in the amount of $750,000, for concurrently selling a Frontier franchisee's South Florida franchise territory to two (2) different parties without the franchisee's knowledge, but with the knowledge and approval of Frontier.

50) Upon further information and belief, Defendant Ferrie was the subject of an investigation by CNA Insurance in 2001 for alleged fraud and other serious misconduct in connection with the "padding" of hourly billing on insurance claims.

51) With full knowledge of Defendant Ferrie's business improprieties, Frontier hired and promoted Defendant Ferrie to an executive position within Frontier's corporate offices as Franchisee Liaison in 2006. From Defendant Ferrie's authoritative position, Ferrie has selfishly used his power for personal gain by way of hand-picking lucrative claims and

11

diverting these claims away from rightful and deserving franchisees to his own personal secret franchise based in Tempe, AZ, as well as non-Frontier insurance adjuster companies for additional commission premiums.

52) Defendant Frontier's negligent hiring and retention of Defendant Ferrie has directly and proximately caused monetary damage to the Continos in the form of diminution of annual business revenue, and a sharp decrease in the valuation of their franchise business.

### E. Misclassified Employer-Employee Relationship

53) Defendants' Franchise Agreements purposefully mischaracterize the relationship between itself and its franchisees as that of an independent contractor/franchisor.

54) Frontier goes well beyond the "typical" franchisor-franchisee relationship and significantly controls the day-to-day operations of its franchisees, rendering the parties' relationship as one of de facto employment.

55) The employer-employee relationship is evinced by, among other things, a heightened and unprecedented level of control by Frontier over its franchisees, including, but not limited to:

    (i) Franchisees required to use Frontier's billing schedules;

    (ii) Frontier's direct solicitation of clients and haphazard distribution of clients to franchisees without regard to franchisee-established relationships with a given insurance company;

    (iii) Regulation client appointments;

    (iv) Required background checks on all franchisee-used independent contractors;

    (v) Mandatory upload of all client/case information to the mandated "FACTS" claim management system;

(vi) Frontier established mandatory "rate zone" pricing scheme, as well as franchisor-determined what zones existing franchisees were in, and the required rate to be charged by that specific zone;

(vii) Mandatory office hours;

(viii) Maintaining errors and omission insurance coverage with a Frontier-selected career;

(ix) the withholding of franchisee commission;

(x) Naming Frontier as additional insured on franchisee personal auto policies.

56) Frontier further asserts control by way of coercion through threats of not receiving work from Frontier.

57) Moreover, Frontier and its franchisees are engaged in the same type of business thereby not permitting to engage in certain other business activity outside the operation of a Frontier franchise.

## COUNT ONE
## BREACH OF FRANCHISE CONTRACT

58) Plaintiffs reallege and incorporate by reference the allegations set forth above.

59) Plaintiffs and Defendant Frontier Adjusters are currently parties to six (6) franchise agreements granting Plaintiffs Jayson Contino and Mamye Contino the right to operate five (5) Frontier Adjuster franchise locations in North Carolina and one (1) in Pennsylvania.

60) Defendant Frontier Adjusters has breached the material terms of their franchise agreement with Plaintiffs by and through the following conduct:

(i) purposefully diverting business to itself and favored franchisees;

    (ii)      surreptitiously implemented the FANRCP to materially change its business model and punish franchisees such as Plaintiffs who did not, or were not invited to, participate in the program;

    (iii)     selling claims to unaffiliated third-party competitors for Frontier and its representatives own pecuniary gain.

61) As a direct and proximate result of Frontier's breach of contract, Plaintiffs have and continue to sustain monetary damages in an amount in excess of $75,000.00.

## COUNT TWO
## CIVIL CONSPIRACY

62) Plaintiffs reallege and incorporate by reference the allegations set forth above.

63) Upon information and belief, beginning in or around 2001, Defendants knowingly, willfully, and maliciously conspired together to improperly and unlawfully deprive the Plaintiffs and other similarly situated, claims referrals in accordance with the Parties' prior course of dealing. This conspiracy was not disclosed until 2009, when Defendants made it known that they had surreptitiously changed the model by which claims were referred to their franchisees.

64) Upon information and belief, the common purpose and object of the conspiracy was to force franchisees to accept the new model of claim referrals, or in the case of Plaintiffs, to purposefully squeeze out longstanding and loyal franchisees, and to divert claims business to corporate or favored franchisees, and, in some instances, even unaffiliated third-party competitors.

65) Individual Defendants Ferrie, Davies, Bolender, Enthoven and Harcourt orchestrated the scheme to divert business and have taken continuous action through 2014 to perpetuate this scheme.

66) Individual Defendants Ferrie, Davies, Bolender, Enthoven, and Harcourt orchestrated the scheme to shut out older and smaller franchisees and foster the creation of only a handful of large franchisees, which they called "mega offices."

67) In furtherance of the conspiracy, the Defendants, and those acting in concert with or under the direction of one or more of them, committed various overt acts, including but not limited to, the creations of various sham agreements, the fraudulent Statements and Omissions, and the acts, practices, transactions, and courses of business described with particularity in the Complaint.

68) As a direct and proximate result of the conspiratorial acts of Frontier, Plaintiffs have been damages in an amount in excess of $75,000.000.

## COUNT THREE
## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT
*N.C. Gen. Stat §§ 75-1.1, et seq.*

69) Plaintiffs reallege and incorporate by reference the allegations set forth above.

70) The acts of the Defendants are in or affecting commerce.

71) The acts of the Defendants constitute unfair and deceptive acts or practices in violation of the North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat §§ 75-1.1, et. seq.

72) Plaintiffs have been and continued to be injured by the unfair and deceptive acts of Defendants in an amount in excess of $75,000.00.

## COUNT FOUR
## VIOLATION OF THE FAIR LABOR STANDARDS ACT and THE WAGE AND HOUR ACT

73) Plaintiffs reallege and incorporate by reference the allegations set forth above.

15

74) This claim arises from Defendant Frontier's willful violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, et seq., for failure to pay various benefits entitled to Plaintiffs pursuant to the FLSA.

75) Here, the employer-employee relationship is evinced by, inter alia, a high level of control that is exerted by Frontier over Plaintiffs.

76) At all times relevant, Defendants have been, and continue to be, an "employer" engaged in interstate commerce and/or the production of goods and/or services for commerce, within the meaning of the FLSA, 29 U.S.C. § 201, et seq.

77) At all times relevant, Defendants employed and continues to employ, employees, including Plaintiffs, who engage or engaged in commerce.

78) At all times relevant, upon information and belief, Defendants have had an annual gross volume of sales made or done business in excess of $3,000.000.

79) The minimum wage provisions of the FLSA, 29 U.S.C. § 201, et seq., apply to Defendant and protect Plaintiffs.

80) Pursuant to the FLSA, 29 U.S.C. § 206, Plaintiffs were entitled to be compensated at a rate of $7.25 per hour.

81) Defendant, pursuant to its policies and practices, refused and failed to pay a minimum wage to Plaintiffs.

82) By failing to compensate Plaintiffs, Defendant violated, and continue to violate Plaintiffs' statutory rights under the FLSA, 29 U.S.C. § 201, et seq.

83) Plaintiffs seek damages in the amount of their respective unpaid wages, liquidated damages as provided under the FLSA, 29 U.S.C. § 216(b) and N.C. Gen. Stat. § 95-25.22, interest and such other legal and equitable relief as the Court deems proper.

84) Plaintiffs seek recovery of attorneys' fees and costs to be paid by Defendants as provided by the FLSA, 29 U.S.C. § 216(b) and N.C. Gen. Stat. § 95-25.22.

## COUNT FIVE
## NEGLIGENT HIRING AND RETENTION

85) Plaintiffs reallege and incorporate by reference the allegations set forth above.

86) For reasons stated above, Defendant Frontier was negligent for its hiring and retention of Defendant Edward Ferrie.

87) Despite Defendant Frontier's knowledge of Defendant Ferrie's past and ongoing business improprieties, outlined in greater detail above, Defendant Frontier – not only retained, but – promoted Defendant Ferrie to an executive position giving him full reign to continue with his tortious business practices with impunity.

88) Moreover, as outlined in greater detail above, Defendant Ferrie's tortious conduct directly and proximately caused Plaintiffs' injuries in an amount in excess of $75,000.00.

**WHEREFORE**, Plaintiffs pray unto the Court for the following relief:

1) An Order declaring and adjudging that Plaintiffs are de facto employees as defined under the FLSA, 29 U.S.C. § 201, et seq., and afforded protections under the FLSA;

2) An award of interest, costs, and attorneys' fees, and all other relief available under the FLSA, 29 U.S.C. § 201, et seq.;

3) Compensatory Damages, consequential damages, and punitive damages;

4) Recoupment of overtime benefits for the five (5) years preceding the filing of the Complaint;

5) Recoupment of all benefits previously withheld from Plaintiffs for the five (5) years preceding the filing of the Complaint;

6) Attorney fees and costs if permissible by law;

7) That all issues be tried to a jury; and

8) Any other relief this court deems equitable and just.

This the 6TH day of October, 2014.

/s/Derek P. Adler
Derek P. Adler, State Bar No. 39488
*Attorney for Plaintiffs*
DeVORE, ACTON & STAFFORD, P.A.
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 facsimile
*dadler@devact.com*

MARKS & KLEIN, LLP
Jerry Marks
Louis Tambaro
Derek Famulari
63 Riverside Avenue
Red Bank, NJ 07701
*Attorneys Pending Pro Hac Vice Counsel*

| | |
|---|---|
| JAYSON CONTINO, an individual, and<br>MAMYE CONTINO, an individual,<br>                                       *Plaintiffs,*<br>vs.<br>FRONTIER ADJUSTERS, INC.,<br>FRONTIER ADJUSTERS OF ARIZONA, INC.,<br>FRONTIER ADJUSTERS OF AMERICA, INC.,<br>MERRYMEETING, INC., JOHN M. DAVIES, an individual, EDWARD FERRIE, an individual,<br>PATRICK ENTHOVEN, an individual,<br>JEFFREY HARCOURT, an individual, and<br>MILO BOLENDER, an individual,<br>                                         *Defendants.* | **VERIFICATION** |

JAYSON CONTINO, after being first duly sworn, deposes and says as follows:

That he is the plaintiff in the foregoing action; that he has read the foregoing COMPLAINT and the allegations contained herein; that same are true of his own knowledge, except as to those matters and things therein stated to be alleged upon information and belief, and as to those matters and things, he believes them to be true.

This the 6 day of October, 2014.

                                                                    JAYSON CONTINO

STATE OF NC

COUNTY OF Buncombe

SWORN to and subscribed before me this the 6th day of October, 2014.

Notary Public

My Commission Expires: 11/3/18

(seal) Margarita J. Gonzalez, Notary Public, Buncombe County, North Carolina